UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KATIE MAYES, individually and for and on behalf of dependent beneficiaries, H. M., a minor child; M. M., a minor child; G.M., a minor child; K. M., a minor child; and, JORDAIN MAYES, beneficiary, | Case No. 4:12-CV-00307-EJL-CWD **MEMORANDUM DECISION AND ORDER** |

                    Plaintiffs,

        v.

WINCO HOLDINGS, INC., an Idaho
corporation,

                    Defendant.

## INTRODUCTION

Pending before the Court in the above-entitled matter are the Defendant's Motion for

Summary Judgment and related Motions to Strike. The parties have filed responsive briefing

and the matters are now ripe for the Court's review. Having fully reviewed the record herein,

the Court finds that the facts and legal arguments are adequately presented in the briefs and

record. Accordingly, in the interest of avoiding further delay, and because the Court

conclusively finds that the decisional process would not be significantly aided by oral

argument, the Motions shall be decided on the record before this Court without oral

argument.

## FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff, Katie Mayes, worked for Defendant WinCo Holdings, Inc. (WinCo) in Idaho Falls, Idaho from April 13, 1999 until her termination on July 7, 2011. (Dkt. 1.)[1] Ms. Mayes began her employment as a department clerk and, in 2006, was promoted to a supervisory position as the Person In Charge (PIC) and Lead Crew (LC) member of WinCo's night time freight crew. (Dkt. 12.) She also served as the store Safety Committee Chief.

Ms. Mayes' termination arose over her having directed another employee, Nick McInelly, to take a cake out of the stales cart from the bakery for her crew to eat. The use of cakes in this manner, Ms. Mayes argues, was a common on-going practice that she had been given approval for by her supervisor. Ms. Mayes claims she was terminated not because of the cake but because her supervisor, Dana Steen, wanted men in charge of the freight crew. WinCo maintains Ms. Mayes was terminated for theft of the cake which constituted gross misconduct and, on that basis, she was denied benefits to continue her health care coverage for herself and her dependents.

Ms. Mayes filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Idaho Human Rights Commission (IHRC). On April 11, 2012, Ms. Mayes received her Notice of Right to Sue letter from the EEOC and IHRC. Having exhausted her administrative remedies, on June 15, 2012, Ms. Mayes, initiated this action by filing a Complaint alleging gender discrimination claims under Title VII, 42 U.S.C. § 2000e-

---

[1] The Complaint has also named as Plaintiffs Ms. Mayes' four minor dependent children and Jordain Mayes, her beneficiary-daughter who is of the age of majority. (Dkt. 12.)

1 *et seq*. and the Idaho Human Rights Act, Idaho Code § 18-7301 and § 67-5901, *et seq.*

(Dkt. 12.) In addition, Ms. Mayes claims 1) WinCo violated the Comprehensive Omnibus

Budget Reconciliation Act of 1985 (COBRA), 29 U.S.C. § 1161, *et seq*., by denying her

continuing health care coverage following her termination and 2) violated federal and state

wage laws, Idaho Code § 44-1503 and § 45-601 and the Fair Labor Standards Act, 29 U.S.C.

§ 203(d), by failing to pay her for her accrued leave and sick time (PTO). Ms. Mayes seeks

compensatory, statutory, and punitive damages as well as costs and attorney fees.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56 of the Federal Rules of

Civil Procedure. Rule 56 provides, in pertinent part, that "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law. The court should state on the record

the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a).[2] "A party asserting

that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to

particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those

made for purposes of the motion only), admissions, interrogatory answers, or other

materials; or (B) showing that the materials cited do not establish the absence or presence

---

[2] Federal Rule of Civil Procedure 56 was revised effective December 1, 2010. Though the Motion for Summary Judgment in this case was filed prior to December 1, 2010, the Court will apply the revised Rule 56 as applying it in this action is not infeasible and does not work an injustice. *See* Fed. R. Civ. P. 86(a)(2)(B).

of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

The party moving for summary judgment has the initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Once the moving party has met this initial burden, the nonmoving party has the subsequent burden of presenting evidence to show that a genuine issue of fact remains. The party opposing the motion for summary judgment may not rest upon the mere allegations or denials of her pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 248. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" then summary judgment is proper as "there can be no 'genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).[3]

---

[3] *See also,* Rule 56(e) which provides:

(e) **Failing to Properly Support or Address a Fact.** If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

  (1)     give an opportunity to properly support or address the fact;
  (2)     consider the fact undisputed for purposes of the motion;
  (3)     grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or
  (4)     issue any other appropriate order.

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)). The Ninth Circuit cases are in accord. *See, e.g., British Motor Car Distrib. V. San Francisco Automotive Indus. Welfare Fund*, 883 F.2d 371 (9th Cir. 1989).

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*Id.* at 374 (citation omitted). Of course, when applying the above standard, the court must view all of the evidence in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Hughes v. United States*, 953 F.2d 531, 541 (9th Cir. 1992).

<h1 style="text-align:center">DISCUSSION</h1>

**I.**     **Motions to Strike**

    **A.**     **WinCo's Motion to Strike Documents - Docket 51**

        **1.**     **Procedural Challenges**

WinCo has filed a Motion to Strike Ms. Mayes' Statement of Disputed Facts and the Affidavits of Chris Priest, Trent Gallup, and Nick McInelly arguing they are untimely and fail to conform to the format required by Local Civil Rule 7.1 and Rule 56(e). (Dkt. 51.) Plaintiffs oppose the Motion. (Dkt. 54.)

As to the timeliness of the materials, it appears that the Affidavits were filed 14 minutes after midnight on the day they were due and the Statement of Undisputed Facts was filed at 9:21 a.m. the morning after they were due because of an oversight. (Dkt. 54.) While the Court does not condone tardy filings, in this case there is no undue prejudice suffered by WinCo resulting from the untimeliness of the filings. As such, the Court denies the Motion to Strike on the basis of timeliness. The Court does caution counsel for Plaintiffs to ensure that future filings are timely made in this and other cases. While the violations may be "technical" and "inadvertent," the fact remains that the filing requirements are not mere guidelines but are actual rules that counsel should conform its practice to ensure are met.

As to the challenge to the Plaintiffs' Statement of Facts, Local Civil Rule 7.1(c)(2) provides that

In responding to a motion for summary judgment under Federal Rule of Civil Procedure 56, in addition to the requirements contained in Federal Rule of Civil Procedure 56(c)(1), the responding party shall also file a separate statement, not to exceed ten (10) pages, of all material facts which the responding party contends are in dispute.

WinCo challenges that no disputed facts are alleged in Ms. Mayes' filing. (Dkt. 51, 56.) Essentially, WinCo disagrees with the format of the Plaintiffs' Statement of Facts to the extent it is a narrative and includes facts which it does not believe are relevant to the Motion for Summary Judgment. (Dkt. 56.) The Court has reviewed the Plaintiffs' Statement of Facts, the applicable rules, and the parties' argument on the issue and denies the Motion to Strike.

### 2. Substantive Challenges

WinCo has also moved to strike the Affidavit of Trent Gallup arguing it contains irrelevant information outside of the time period at issue. (Dkt. 50, App. A.) Specifically, WinCo points out that Mr. Gallup was employed by WinCo from 2000 to 2007 but Ms. Mayes' claims relate to her termination in 2011. Further, WinCo notes that the store manager at the time of Mr. Gallup's employment was Mark Wright, not Dana Steen whom Ms. Mayes alleges discriminated against her based on her gender. Thus, WinCo argues, Mr. Gallup's observations between 2000 and 2007 are irrelevant to the facts and circumstances relating to Ms. Mays' claims raised here arising from events in 2011.

Mr. Gallup's Affidavit discusses his personal observations concerning Ms. Mayes, other WinCo employees, and the practice concerning the use of in-store items by employees during the term of his employment from 2000 to 2007. As to WinCo's

objection to the timeliness of the materials in the Affidavit, the Court will consider the materials only to the extent they are relevant to the time period during which Mr. Gallup was employed at WinCo. For instance, as to Ms. Mayes' contentions that the practice of using in-store items had occurred and been ongoing prior to her termination in 2011. The fact that WinCo may argue the facts concerning this alleged practice had changed following Mr. Gallup's term of employment does not, in and of itself, render Mr. Gallup's Affidavit entirely irrelevant such that it should be stricken. The Motion is denied.

### B. Plaintiffs' Motion to Strike Declarations - Docket 53

Plaintiffs seeks to strike the Declarations of Beth Rieb and Ben Swanson filed with WinCo's Reply Brief or, alternatively, asks to be allowed to file a sur-reply. (Dkt. 53.) Plaintiffs argue the materials are improper additional evidence filed in violation of the applicable rules which Plaintiffs have not had an opportunity to address. WinCo maintains that the materials are proper because the rules allow such submissions with a reply brief to address new issues raised in a response brief. (Dkt. 57.) Plaintiffs counter arguing no new issues were raised necessitating the filing of additional materials. (Dkt. 58.)

"It is well established in this circuit that '[t]he general rule is that appellants cannot raise a new issue for the first time in their reply briefs.'" *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) (quoting *Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918 924 (9th Cir. 1988)); *see also Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir.1996) ("Issues raised for the first time in the reply brief are waived."). When new

material is raised, courts have discretion to strike that material. *See, e.g, Tovar v. United States Postal Serv.*, 3 F.3d 1271, 1273 (9th Cir. 1993) (striking portions of a reply brief that presented new information).

However, reply affidavits that respond only to the opposing party's brief are properly filed with a reply brief. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477 (6th Cir. 2002). "While the Rules are silent as to timing matters with reply affidavits, precedent establishes that, in the face of new evidence, the court should permit the opposing party an opportunity to respond" so long as no element of surprise or prejudice is created by doing so. *Peters*, 285 F.3d at 477. The Ninth Circuit has also recognized that "[w]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (quoting *Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990)).

Ben Swanson is WinCo's Director of Labor Relations. (Dkt. 50, Att. 3.) In his Declaration, Mr. Swanson states that WinCo's Idaho Falls store is established as a union facility which means that each new hire automatically becomes subject to the Collective Bargaining Agreement (CBA). (Dkt. 50, Att. 3.) He goes on to note that an Employee Association Committee negotiates and signs the CBA that binds all of WinCo's hourly, non-management employees at the Idaho Falls store. A copy of the CBA is posted near the break room in the Idaho Falls store.

The Court finds that Ms. Mayes did argue in her response brief that she is not bound by the CBA and that the CBA is an illegal and unenforceable contract. (Dkt. 44 at 20.) This question is a new challenge to WinCo's position that Ms. Mayes' wage claim fails because of the terms of the CBA. As such, the Court denies the Motion to Strike as to Mr. Swanson's Declaration. The Declaration was filed in response to a new argument raised by Ms. Mayes in her response brief concerning the CBA. (Dkt. 44.) No sur-reply is necessary.

Beth Rieb is a Human Resources Specialist for WinCo who states in her Declaration that WinCo regularly makes strategic and policy decisions concerning whether it will contest a former employee's claim for unemployment benefits and that WinCo regularly declines to participate. (Dkt. 50, Att. 2.) Ms. Rieb then goes on to describe why WinCo did not opt to participate in Ms. Mayes' unemployment proceedings. Attached to Ms. Rieb's Declaration are materials relating to those proceedings.

The Court finds that Ms. Mayes did not raise a new issue concerning the Idaho Industrial Commission's determination. In her response brief, Ms. Mayes makes two references to the Idaho Industrial Commission's determination. (Dkt. 44 at 5, 15.) Attached to Ms. Mayes' response brief is the Idaho Industrial Commission's decision. (Dkt. 44, Ex. F.) The Court finds these references are not new arguments as much as they are narrative discussion of the history of her case.

Further, the findings of the Idaho Industrial Commission are not binding on this Court. *See* Idaho Code § 72-1368(11)(b) ("No finding of fact or conclusion of law contained in a decision or determination rendered pursuant to this chapter by an appeals examiner, the industrial commission, a court, or any other person authorized to make such determinations shall have preclusive effect in any other action or proceeding, except proceedings" brought in four circumstances not present here.). Accordingly, the Motion to Strike is granted as to Ms. Rieb's Declaration and attached materials concerning the Idaho Industrial Commission. The Court will not consider these materials in ruling on the Motion for Summary Judgment. Likewise, the Court has not considered Ms. Mayes' references to the Idaho Industrial Commission's findings as they are not binding here. Also attached to Ms. Rieb's Declaration are pages from Ms. Mayes' personnel file. To the extent these pages relate to Ms. Mayes' argument that the CBA does not apply to her, the Court finds these pages appropriate for its consideration of that question for the reasons stated above as to Mr. Swanson's Declaration.

### C.     Plaintiffs' Motion to Strike Declaration - Docket 43

Ms. Mayes has filed a Motion to Strike the Declaration of Gary Pickel and attached expert report arguing the materials are irrelevant, lack foundation, makes legal conclusions, and contains hearsay. (Dkt. 43.) WinCo opposes the Motion arguing Mr. Pickel has adequate personal knowledge to address the relevant topics contained therein and, regardless, the Motion specifically challenges only five paragraphs of his

Declaration. (Dkt. 52.)[4] WinCo notes that it filed Mr. Pickel's Declaration in support of its Motion for Summary Judgment on the question of what constitutes gross misconduct for purposes of determining whether a terminated employee qualifies for COBRA coverage. WinCo maintains that Mr. Pickel's materials are proper Rule 56 expert testimony given concerning areas within his expertise and personal knowledge relating to the facts at issue in this case. (Dkt. 52.) In reply, Ms. Mayes argues the testimony is not relevant and otherwise fails to apply the appropriate analysis for defining gross misconduct. (Dkt. 55.)

Mr. Pickel's Declaration and attached report concern his interpretation of WinCo's employee policies based on his time spent working in the grocery store industry. (Dkt. 40-4.) In particular, Mr. Pickel offers his opinion as to WinCo's personnel policies and the Collective Bargaining Agreement. Mr. Pickel further makes generalized statements concerning the rights of businesses concerning employment matters and conclusions as to Ms. Mayes' conduct at issue in this matter.

The Court may consider expert opinion testimony in ruling on a summary judgment motion so long as it contains facts that would be admissible at trial and the opinion is based on the expert's personal knowledge. In considering expert testimony, the Court has a "gatekeeping responsibility" to objectively screen such testimony to ensure

---

[4] WinCo further argues the Motion to Strike is improperly filed as it should have been filed as an Appendix to Plaintiffs' Response brief pursuant to Local Civil Rule 7.1(d). (Dkt. 52.) The Local Civil Rule cited by WinCo was a proposed amendment to the Local Civil Rules that was never adopted. The Court's website clarifies this at http://www.id.uscourts.gov/rules.htm.

that it "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999) (clarifying the court's "gatekeeping" obligation "applies not only to testimony based on 'scientific knowledge,' but also to testimony based on 'technical' and 'other specialized' knowledge"). Prior to considering proffered expert testimony, a trial court "must merely make a determination as to the proposed expert's qualifications." *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir. 1994). A court is not to attempt to determine whether an expert's conclusions are correct, but rather examine only "the soundness of his methodology." *Daubert*, 43 F.3d at 1318. In doing so on a motion for summary judgment, the Court does not weigh the persuasiveness or credibility of one expert as compared to the other but, instead, only determines whether there is a genuine issue for trial.

In general, contract interpretation is a matter of law for the Court. *Flores v. Arizona*, 516 F.3d 1140, 1166 (9th Cir. 2008). Expert "testimony cannot be used to provide legal meaning or interpret [a contract] as written." *McHugh v. United Serv. Auto. Assoc.*, 164 F.3d 451, 454 (9th Cir. 1999) (citation omitted). But, an expert can testify about the practices and norms of an industry if the expert is "qualified as an expert by knowledge, skill, experience, training, or education." *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (quoting Federal Rule of Evidence 702). The Ninth Circuit has also recognized that there may be "instances in rare, highly complex and technical matters where a trial judge utilizing limited and controlled

mechanisms, under the matter of trial management, permits some testimony seemingly at variance with the general rule." *Flores*, 516 F.3d at 1166 (citation omitted).

This case does not present such a highly complex or technical matter that necessitates expert opinion as to the interpretation of the contract. Accordingly, the Court will grant the Motion to Strike as to any opinion testimony on how the contract should be interpreted for purposes of this summary judgment motion. The Court will, however, allow Mr. Pickel's testimony about industry practices and norms. In so ruling, the Court makes no determination at this time as to the admissibility of this evidence and/or testimony at trial.

## II.    Gender Discrimination Claim

Title VII of the Civil Rights Act of 1964 prohibits employers from to failing or refusing to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment or otherwise limit, segregate, or classify an individual so as to deprive that individual of employment opportunities because of such individual's race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a).[5]

---

[5] Ms. Mayes has also asserted a claim under the IHRA, Idaho Code § 67–5901, *et seq*. The Idaho Supreme Court has held the analysis under Title VII applies to claims under IHRA. *See Hoppe v. McDonald*, 644 P.2d 355, 358 (Idaho 1982); *see also Sengupta v. Morrison–Knudsen Co., Inc.*, 804 F.2d 1072, 1077 (9th Cir. 1986). Accordingly, the Court's decision on Ms. Mayes' Title VII claim also applies to her IHRA claim.

"In order to prevail in a Title VII case, the plaintiff must establish a prima facie case of discrimination." *Vasquez v. County of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003) (citing *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997)). To do so here, Ms. Mayes must offer evidence that "give[s] rise to an inference of unlawful discrimination," either through the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or with direct or circumstantial evidence of discriminatory intent. *Id.*; *see also Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

"The requisite degree of proof necessary to establish a prima facie case for [a] Title VII claim[] on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis*, 26 F.3d at 889 (citation omitted). "The amount [of evidence] that must be produced in order to create a prima facie case is 'very little.'" *Id.* (quoting *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991)).

## A.     Direct Evidence of Discriminatory Intent

Ms. Mayes argues WinCo fired her because of her gender, not for any violation of company policy. (Dkt. 44 at 5-7.) Instead of utilizing the burden-shifting framework detailed above, Ms. Mayes argues she can introduce sufficient direct evidence of discriminatory intent to prevail on the Motion.

"Direct evidence is evidence 'which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'" *Coghlan v. American Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (citation omitted). It "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Id.* Stated differently, "[d]irect evidence ... is defined as evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude...sufficient to permit the *fact finder* to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem-Keiser Yellow Cab, Inc.*, 389 F.3d 802, 812 (9th Cir. 2004) (an ADEA claim) (citation omitted). Where discrimination is proven by direct evidence it negates the need to engage in the *McDonnell Douglas* burden shifting analysis. *Id.* (citation omitted).

The direct evidence Ms. Mayes points to are statements made and actions taken by the store manager, Dana Steen. (Dkt. 44 at 6-7.) The statements allegedly related to Ms. Steen's disapproval of Ms. Mayes performing work that was more suited for a man, indications that Ms. Steen wanted to give the position to a man, and negative statements concerning Ms. Mayes being unable to work beyond her shift because of her children. Ms. Mayes also alleges in December of 2010, prior to her termination, Ms. Steen removed Ms. Mayes as the Store Safety Committee Chief and replaced her with a man. Additionally, Ms. Mayes notes that WinCo filled the position from which she was terminated with a man.

These allegations are made based primarily upon Ms. Mayes' own deposition testimony relaying statements allegedly made by Ms. Steen and told to Ms. Mayes from other employees. This testimony is directly controverted by the testimony of others; including Ms. Steen. Even assuming the facts are as Ms. Mayes alleges, the comments and conduct of Ms. Steen relied upon for this claim lack a temporal and contextual nexus to Ms. Mayes' termination such that the fact finder could infer that a discriminatory attitude was more likely than not a motivating factor in the decision to terminate Ms. Mayes. *See Vasquez*, 349 F.3d at 640 (plaintiff failed to offer evidence of direct evidence of discriminatory intent where there was no nexus between the discriminatory remarks and the subsequent employment decisions to show that discriminatory animus motivated the decision). The alleged comments were made at least six months prior to Ms. Mayes' termination. Additionally, Ms. Steen did not make the decision to terminate Ms. Mayes. WinCo's Human Resources and Loss Prevention Departments conducted the investigation into the cakes and terminated both Ms. Mayes and Mr. McInelly. There is no evidence of conduct or statements by persons involved in the decision to terminate that the jury can rely upon as directly reflecting the alleged discriminatory attitude sufficient to permit it to infer that the attitude was more likely than not a motivating factor in the employer's decision. *Enlow*, 389 F.3d at 812. Therefore, the Court will employ the *McDonnell Douglas* burden shifting analysis to determine if Ms. Mayes has established a prima facie case of gender discrimination.

**B.** *McDonnell Douglas* **Analysis**

Under the burden shifting analysis set forth in *McDonnell Douglas*, Ms. Mayes

bears the initial burden of demonstrating the elements of the prima facie case for each of

her claims which can be accomplished through either direct or circumstantial means. *See*

*Coleman v. The Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000); *Wallis*, 26 F.3d at

889. Upon making this showing, the burden then shifts to WinCo to produce evidence of

a legitimate, nondiscriminatory reason for its action. *See Enlow*, 389 F.3d at 813 ("[I]f an

employee presents prima facie circumstantial evidence of discrimination, the burden

shifts to the employer to produc[e] evidence that the plaintiff was rejected, or someone

else was preferred, for a legitimate, nondiscriminatory reason."); *Bergene v. Salt River*

*Project Agr. Imp. and Power Dist.*, 272 F.3d 1136, 1140 (9th Cir. 2001). The burden then

reverts back to Ms. Mayes to establish that WinCo's legitimate nondiscriminatory reason

for termination was merely pretext and that discrimination more likely motivated its

decision to terminate. *See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 747 (9th Cir. 2003).

**1.     Prima Facie Case**

The prima facie case of discrimination under Title VII requires Ms. Mayes to show

that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was

subject to an adverse employment action; and (4) similarly situated individuals outside

her protected class were treated more favorably. *Nicholson v. Hyannis Air Serv., Inc.*, 580

F.3d 1116, 1123 (9th Cir. 2009) (citation omitted). Plaintiffs need only produce

"minimal" evidence to meet this showing for summary judgment purposes. *See Aragon v.*

*Republic Silver State Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir. 2002) (describing

plaintiff's burden with respect to the prima facie showing as "minimal"); *Chuang v. Univ.*

*of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (finding that employment

discrimination plaintiffs need produce "very little evidence" in opposing defendant's

motion for summary judgment). "Of course, '[a]though intermediate evidentiary burdens

shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times

with the plaintiff.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir.

2002) (quoting *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142–43 (2000)).

WinCo challenges that Ms. Mayes cannot establish the second and fourth elements

of the prima facie case. (Dkt. 40 at 7.) The Court agrees that the first and third elements

are met here and will address only the two contested elements below.

### a)    Qualified for the Position/Performing to Legitimate Expectations

Ms. Mayes argues that, other than its reasons for her termination, she was meeting

WinCo's expectations and was qualified for the position. (Dkt. 44 at 8.) WinCo counters

that Ms. Mayes was not meeting its expectations because she had committed theft and

been dishonest. (Dkt. 40 at 7.) Ms. Mayes disputes the characterization of her conduct as

"theft," arguing the stale cakes had no value, she had permission to use the cakes in the

manner in which she did, management was aware of the practice, and it was a common

for other management employees to use the cakes in the same fashion. (Dkt. 44 at 9) (Dkt. 44-1, Aff. Mayes.)

The parties cite different language for this the second element of the prima facie case. Ms. Mayes states the second element as being whether she was qualified for the position. (Dkt. 44 at 8.) WinCo, on the other hand, states the second element as whether "she was performing according to her employer's legitimate expectations." (Dkt. 40 at 7) (citing *Vasquez*, 349 F.3d at 640.) Regardless of the exact language for this element, what is required at this stage is that Ms. Mayes make a minimal showing that despite WinCo's stated reason for her termination that she was otherwise meeting WinCo's expectations and/or was qualified for the position. In other words, that Ms. Mayes able to fill the job description. In considering this factor, the Court considers Ms. Mayes' self-assessment of her performance and any external factors going to show whether she was capable of fulfilling the duties of the position. *See Aragon*, 292 F.3d at 660.

Looking at Ms. Mayes' evidence on this factor, independent from WinCo's stated reason for her termination, the Court finds Ms. Mayes has satisfied the second prong. It is undisputed that Ms. Mayes had received no negative job performance reviews, had been promoted in the company, had been placed in a leadership position as the Person In Charge (PIC), and had perfect attendance for her shifts. The Court finds Ms. Mayes has established the second prong of the prima facie case.

### b)    Similarly Situated Individuals Outside her Protected Class were Treated More Favorably

As to the fourth element, Ms. Mayes contends that she was replaced by a male and was treated differently from other male employees who were aware of and participated in the same use of the cakes. (Dkt. 44 at 10.) WinCo counters that it terminated the other employee who admitted to taking cake, Nick McInelly, and that the individuals hired to replace Ms. Mayes were the most qualified applicants. (Dkt. 40 at 8.)

To meet her burden under the fourth prong of the *McDonnell Douglas* test, Ms. Mayes must show that similarly situated male employees were treated more favorably. The Court first must decide whether any of the male employees identified by Ms. Mayes were "similarly situated" to her. For purposes of a disparate treatment discrimination claim, employees are similarly situated where they "have similar jobs and display similar conduct." *Nicholson*, 580 F.3d at 1125 (citation omitted). "The employees need not be identical; they must simply be similar in all material respects." *Id.* (emphasis in original) (quotation and citation omitted).

This fourth factor can be met either by a showing of replacement or by a comparison to similarly situated individuals. For instance, in *Villiarimo v. Aloha Island Air, Inc.*, a gender discrimination case, the court described the fourth element as "similarly situated men were treated more favorably, or her position was filled by a man." 281 F.3d at 1062; *see also Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996) (describing proof of replacement and comparison with similar individuals as

alternative ways of making prima facie case). In this case, then, Ms. Mayes satisfies her

prima facie burden with respect to the fourth element by showing that WinCo hired a

male to replace her.

### c) Conclusion

Because Ms. Mayes has established a prima facie case for summary judgment

purposes, she enjoys a presumption of unlawful discrimination, which WinCo can rebut

only if it offers a legitimate, nondiscriminatory reason for the adverse employment action.

*Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840, 849 (9th Cir. 2004)

(citing *Lyons*, 307 F.3d at 1112); *see also Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217,

1220 (9th Cir. 1988) (unlawful discrimination is presumed under the *McDonnell Douglas*

test if the plaintiff can show the elements of the prima facie case). If WinCo provides a

legitimate reason, the burden then shifts back to Ms. Mayes to show that the reason given

is a pretext. *Id.* (citing *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003)).

### 2. Legitimate Non-Discriminatory Reason

The Court finds WinCo has shown a legitimate reason for Ms. Mayes' termination.

WinCo maintains that Ms. Mayes was terminated solely because of her theft and

dishonesty. (Dkt. 40.) This is a legitimate non-discriminatory reason for Ms. Mayes'

termination and, therefore, the burden shifts back to Ms. Mayes to show pretext.

### 3. Pretext

To show pretext, Ms. Mayes needs to produce sufficiently specific and substantial

evidence to raise a triable issue of fact as to whether the reasons proffered by WinCo for

her termination were a pretext for discrimination - i.e. "that the proffered reason was not the true reason for the employment decision." *Snead v. Metropolitan Property & Casualty Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001). "A plaintiff 'may prove pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Bodett v. Coxcom, Ind.*, 366 F.3d 736, 743 (9th Cir. 2004) (citing *Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185, 1196 (9th Cir. 2003) (citation omitted)); *see also Fonseca* ("[A] plaintiff can prove pretext either '(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer.'") (quoting *Lyons*, 307 F.3d at 1113 (9th Cir. 2002) (citation omitted)). The evidence proffered can be circumstantial or direct. *Godwin*, 150 F.3d at 1221-22.

"When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial.... Direct evidence is evidence, which, if believed, proves the fact of discriminatory animus without inference or presumption." *Bodett*, 366 F.3d at 744 (citation omitted). "[W]here direct evidence is unavailable, however, the plaintiff may come forward with circumstantial evidence ... to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable. Such evidence ... must be 'specific' and 'substantial' in order to create a

triable issue with respect to whether the employer intended to discriminate on the basis of [a prohibited ground]." *Id.* (citation omitted); *see also Lyons*, 307 F.3d at 1113 (quotation and citation omitted) (When the plaintiff relies upon circumstantial evidence to establish pretext, that evidence "must be specific and substantial in order to survive summary judgment.").

Though a plaintiff may rely upon the same evidence used to establish the prima facie case, they must do more than simply deny the defendant's stated justification for the termination and they must offer "specific substantial evidence of pretext." *Coleman*, 232 F.3d at 1282 (quoting *Wallis*, 26 F.3d at 890). To satisfy its burden, a plaintiff must "produce enough evidence to allow a reasonable factfinder to conclude either: (a) that the alleged reason for [the] discharge was false, or (b) that the true reason for his discharge was a discriminatory one." *Nidds*, 113 F.3d at 918.

### a) Direct Evidence

Here, Ms. Mayes again argues she has direct evidence of Ms. Steen's animus towards her based on her gender. (Dkt. 44 at 10.) In particular, Ms. Mayes argues she was replaced by a male employee, other male employees who knew of and participated in eating the cake were not disciplined, Ms. Mayes had openly used the cakes in a manner allowed and known of by WinCo, she was never told that such use of the cakes was in violation of any WinCo policy, and other employees who violated the policy for in-store use were not terminated. In reply, WinCo maintains that Ms. Mayes has not shown

pretext because her conduct was in violation of store policy and others who may have been involved or known of the incident were not similarly situated to Ms. Mayes. (Dkt. 50.)

The Court finds Ms. Mayes has not come forward with specific and substantial direct evidence that her termination was based on a discriminatory motive such that there is a triable issue of fact as to WinCo's actual motivation. Again, direct evidence is "evidence, which, if believed, proves the fact of discriminatory animus without inference or presumption." *Bodett*, 366 F.3d at 744 (citation omitted). Although the statements allegedly made by Ms. Steen generally elude to gender, they are not linked or related to Ms. Mayes' termination either in their timing or context. Ms. Steen's alleged comment that she wanted men as the PICs for the freight crew is the most relevant comment but, again, it is lacking any nexus to Ms. Mayes' termination because Ms. Steen did not make the decision to terminate Ms. Mayes. The fact that the position was filled by a man does not, in and of itself, directly establish pretext. Although Ms. Steen weighed in, the decision as to who would replace Ms. Mayes was made by other WinCo management. (Dkt. 40-11 at 52.)

As to her argument regarding other employees who were not disciplined, Ms. Mayes points in particular to Andrews Olson who held the same position as she did on the freight crew and admitted to knowing of and partaking in the cakes but was not

disciplined. (Dkt. 44 at 10.)[6] In his deposition, Mr. Olson stated that he was aware of a practice of using cakes to celebrate a few special events for the freight crew but that he had never approved for any one to take a cake. (Dkt. 40-13 at 23-24.) Mr. Olson denied that the cakes were ever used to motivate the freight crew but were instead for birthdays.

Mr. Olson is differently situated from Ms. Mayes in that he never took a cake from the bakery to the break room or authorized another to do so. *See Vasquez*, 349 F.3d at 641 (similarly situated employees "have similar jobs and display similar conduct."). Although he may have eaten a piece of the cake, the fact that he was not responsible for the cake being brought to the break room places him in a different position than Ms. Mayes. Those involved in the investigation stated in their deposition that had Mr. Olson taken a cake he would have been terminated. (Dkt. 40-1, Depo. McCartney at 98-99) (Dkt. 40-11, Depo. Steen at 133.) Because Mr. Olson did not take a cake from the bakery, he was not similar to Ms. Mayes and, therefore, was not treated more favorably than she.

Based on the foregoing the Court finds that Ms. Mayes has not produced direct evidence of pretext. Neither the comments/conduct of Ms. Steen, the failure to discipline other employees who ate the cake, nor the fact alone that she was replaced by male employees show direct evidence that WinCo's motivation for her termination was based on her gender. Because the facts alleged by Ms. Mayes do not directly prove a

---

[6] Mr. Olson initially denied having ever partaken of any of the cakes but later acknowledged that he was seen on surveillance video eating a piece. (Dkt. 40-13 at 25, 56-57.)

discriminatory animus, the Court moves on to consider whether Ms. Mayes has shown pretext by way of circumstantial evidence.

### b) Circumstantial Evidence

Ms. Mayes argues WinCo's reasons for her termination are pretextual and unworthy of credence because the actions for which she was allegedly terminated were common practices that had gone on for years and were known to WinCo management, Ms. Steen harbored animus against her because of her gender, other employees were not similarly terminated, she was replaced by males, and she had approval to take cakes for the freight crew. (Dkt. 44.) Again, WinCo counters that these reasons do not show pretext because Ms. Mayes had violated store policy by taking the cake and the other involved employees were not similar to Ms. Mayes. (Dkt. 50.)

On the record here, the Court finds Ms. Mayes fails to present "specific and substantial evidence" creating a triable issue with respect to whether WinCo's alleged reason for her discharge was false or the true reason for the discharge was a discriminatory one. *Coleman*, 232 F.3d at 1282, *Nidds*, 113 F.3d at 918. The evidence cited to by Ms. Mayes does not support a finding of pretext. The record cited by Ms. Mayes does not show that WinCo's proffered motive for her termination was not the actual motive because of any inconsistency or because the stated motivation is not otherwise believable. WinCo has consistently maintained its reason for terminating Ms. Mayes was her theft and/or dishonesty regarding the taking of the cake in violation of WinCo's policy. Ms. Mayes does not deny taking the cake. Instead she argues that Ms.

Steen made discriminatory comments to her based on her gender and that she was improperly terminated. Even if the parties disagree over whether or not Ms. Mayes' actions in fact violated WinCo's policy, such disagreement does not give rise to an inference let alone a finding that her termination was because of her gender.

## I.    Ms. Steen's Comments/Conduct

The gender discrimination claim is based solely on Ms. Steen's comments and conduct. (Dkt. 12) (Dkt. 40-10 at 129-30.) Ms. Mayes stated during her deposition that Ms. Steen did not like her, Ms. Steen preferred male employees, and that Scott McCartney had told Ms. Mayes that Ms. Steen only wanted an all male freight crew and males in the PIC position. (Dkt. 40-10 at 117-20, 128.) Ms. Mayes also testified that at the beginning of January 2011 she asked Ms. Steen why her position as the Safety Committee Chairperson was given to another male employee, to which Ms. Steen replied that she thought a male would be better in that position. (Dkt. 40-10 at 118, 124-25.) Ms. Mayes further testified that there were a couple of times that Ms. Steen referred to Ms. Mayes having children as the reason why Ms. Mayes was not able to come in on her days off or stay later - noting Ms. Steen did not make similar remarks to Andrew Olson when he left to pick up his daughter. (Dkt. 40-10 at 120-23, 125.) Ms. Mayes stated that she reported the discrimination by Ms. Steen to Scott McCartney who told her to "stay away from her" and that "she doesn't like you because you're a female because she wants the two male employees on for PIC's." (Dkt. 40-10 at 132-33.) Whether Ms. Steen made these remarks is disputed.

Ms. Steen denied making any such comments in her deposition. Mr. McCartney testified in his deposition that he did not recall discussing with Ms. Mayes her concerns about Ms. Steen discriminating against her or telling Ms. Mayes that Ms. Steen wanted only men working on the freight crew. (Dkt. 40-12 at 42-45.) Mr. McCartney denied ever making the statements about Ms. Steen as Ms. Mayes had testified to in her deposition. Likewise, Ms. Steen denied making the comments and testified in her deposition that she had no say on who was on the Safety Committee and that she had not requested that Ms. Mayes be removed from the committee. (Dkt. 40-11 at 49.)

Even assuming Ms. Mayes' alleged facts are true, the comments and remarks attributed to Ms. Steen do not suggest a discriminatory motive for Ms. Mayes' termination apart from WinCo's stated reasons for her termination. "Stray" remarks alone are insufficient to establish discrimination. *See Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir.1990) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252 (1989)). Though Ms. Mayes alleges Ms. Steen made comments regarding her having to leave because of her children and the fact that the position was better suited for a man, the evidence in the record does not reveal that such remarks were made in relation to Ms. Mayes' termination. Even when combining such alleged remarks with Ms. Mayes' other arguments of pretext, the Court finds the evidence of gender based discrimination is lacking. *See Shager v. Upjohn Co.*, 913 F.2d 398, 403 (7th Cir. 1990) (When combined with other evidence of pretext, an otherwise stray remark may create an ensemble sufficient to defeat summary judgment.). The evidence pointed to by Ms. Mayes does not

support her claims that Ms. Steen or WinCo fired her because of her gender. There simply is no link between Ms. Mayes' termination and the alleged violating conduct.

The time frame for the discriminatory remarks allegedly made by Ms. Steen as well as the allegations regarding Ms. Mayes having been removed as the Safety Committee Chairperson is that they occurred in late 2010 or January of 2011, which would have been several months before Ms. Mayes' termination in July of 2011. (Dkt. 40-10 at 117-21.) There is, however, no allegation that the remarks were connected to Ms. Mayes' termination.

Ms. Mayes testified in her deposition that when she confronted Ms. Steen about why she had given the Safety Committee Chairperson position to another male employee, that Ms. Steen responded a male would be better in that position. (Dkt. 40-10 at 124.) Again, this remark was made several months before Ms. Mayes' termination and the person allegedly making the statement, Ms. Steen, did not make the decision to terminate Ms. Mayes.

Even assuming Ms. Steen made the alleged comments, there is no apparent or evident connection to any other adverse employment decision relating to Ms. Mayes. Thus, the stray remarks allegedly made by Ms. Steen do not show pretext. *See Merrick*, 892 F.2d at 1438–39 (recognizing that "stray" remarks are insufficient to raise an inference of discrimination and concluding that a comment by the decision-maker that he selected a candidate for a promotion because the candidate was a "bright, intelligent, knowledgeable young man" was a stray remark that did not raise an inference of age

discrimination); *Peters v. Shamrock Foods Co.*, 262 F. Appx 30, 32 (9th Cir. 2007) (concluding that a "mom" comment was a stray remark, stating "a single comment related to a separate employment action made two years prior to [the plaintiff's] nonselection for the Food Service Sales Manager position is not direct evidence of [gender] discrimination."); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir.1993) (concluding that a superior's comment, not tied directly to the adverse employment decision, that "[w]e don't necessarily like grey hair" did not support an inference of age discrimination).

### ii.    Investigation

There is no evidence or facts alleged showing that the investigation into the taking of the cakes was related to or motivated by any gender bias. The investigation into the taking of cakes began on July 7, 2011 when the bakery manager, Terri Bruun, reported the missing cakes to Ms. Steen. (Dkt. 40-11 at 103-06 and Dkt. 44-14.) Ms. Steen testified that after the bakery employee told her about a missing cake, she checked into the missing cake and then contacted Scott Samuelson, the WinCo Loss Prevention Department Investigator. (Dkt. 40-11 at 103-06) (Dkt. 44-14.) Mr. Samuelson similarly testified that the investigation into the taking of cakes began because store management notified him that they had been seeing a bunch of cake labels stuck to grocery carts in the bakery department. (Dkt. 44-9 at 31.) There is no evidence or any alleged facts that Ms. Steen initiated the investigation in to the taking of the cake because of any gender discrimination she held against Ms. Mayes. Just the opposite, the record shows that no one knew who had taken the cakes when the investigation began. In particular, Ms. Steen

testified that she did not know Ms. Mayes was involved at the time the investigation began. (Dkt. 40-11 at 120.)

Further, Ms. Steen's involvement in the investigation does not show pretext. Ms. Steen began the investigation when the missing cake from July 7, 2011 was brought to her attention. She checked with her bookkeepers and met with the store's Loss Prevention Department and reviewed the store's video tapes to verify that a cake had been taken. (Dkt. 40-11 at 103-106, 108-115, 118, 147-155, 164.) Ms. Steen testified that she reviewed surveillance tapes from December of 2010 to July of 2011 and saw Nick McInelly take cake on 13 separate occasions including having taken the missing cake on July 7, 2011. (Dkt. 40-11 at 107.)[7] Ms. Steen then called Mr. Samuelson early in the morning of July 8, 2011 and turned the investigation over to his department.[8] Ms. Steen then left for vacation. (Dkt. 40-11 at 41.)

Ms. Steen stated she called Mr. Samuelson once or twice while she was on vacation for an update on the investigation. For much of Ms. Steen's deposition testimony she does not recall her level of involvement or awareness concerning the ongoing investigation although she did recall asking Melissa Luker, Terri Bruun, Andrew Olson to

[7]During Ms. Steen's deposition testimony there was some confusion concerning which months of video she had reviewed. (Dkt. 40-11 at 101, 106, 110-118.) The result is the same. Ms. Steen verified the report that a cake had been taken from the bakery and then turned the investigation over to the Loss Prevention Department.

[8]Ms. Steen also stated that during the course of her review of the video tapes she also saw Ms. Mayes bring a cake into the break room in the early morning of June 26, 2011. This appears to be the first time Ms. Steen would have any indication that Ms. Mayes may have some involvement in taking cakes. Again, however, there are no facts that the investigation by Ms. Steen was prompted by anything related to Ms. Mayes - let alone any gender discrimination.

send in statements regarding the in-store taking or using of cakes. (Dkt. 40-11 at 127-29, 130-131, 131-32.) Ms. Steen testified in her deposition that she had also contacted Scott McCartney and Brad Clark, before she left for vacation about whether they had authorized Nick McInelly to take a cake. (Dkt. 40-11 at 119-20.) Both Mr. Clark and Mr. McCartney told Ms. Steen that they had not given the freight crew prior permission to take cakes.

In his investigation, Mr. Samuelson also reviewed store tapes for the prior months and noticed two freight crew employees, Ms. Mayes and Mr. McInelly, were taking cakes from both the stales cart and the shelf in the bakery department and taking them to the break room without any documentation. Mr. Samuelson interviewed both employees. Mr. McInelly told him that Ms. Mayes had instructed him to take the cakes.[9] Mr. Samuelson recalled that Ms. Mayes admitted to him that she gave Mr. McInelly permission to bring cakes into the break room and to also doing so herself on occasion. (Dkt. 47.) Ms. Mayes told him that she had permission from her former manager, Mark Wright, and that management, Melanie Baster, Brad Clark, and Scott McCartney, knew about the practice of using cakes in this manner to motivate the freight crew. (Dkt. 44-9 at 33-34.) Mr. Samuelson turned over all the information from his investigation to management and the Human Resources Department. (Dkt. 47.)

---

[9] Mr. McInelly stated in his Affidavit that he was approached in the very early morning hours of July 8, 2011 by Scott Samuelson who aggressively questioned him in the store's security office concerning the in-store use of cakes. (Dkt. 45-1, Aff. McInelly.) Later that morning, Mr. McInelly stated he met with Mr. McCartney and was questioned again and ultimately terminated at that time.

Clearly Ms. Steen had some involvement in the initial investigation into the report that a cake had been taken from the bakery. By her own account she had reviewed the video surveillance tapes and identified Mr. McInelly as the employee who had taken the cake reported missing on July 7, 2011. (Dkt. 40-11 at 107.) The matter was then turned over to the Loss Prevention Department who pursued the investigation further while Ms. Steen left for vacation. While on vacation, Ms. Steen did have contact with the investigation and apparently did do some follow up with other employees concerning the claims that they had approved the use of cakes as alleged by Ms. Mayes. There is no indication that the mere fact that Ms. Steen was involved in the investigation was based on any gender discrimination. Further, there is no allegation that the investigation itself was tainted by any gender discrimination.[10]

### iii.    Decision to Terminate

More telling is the fact that Ms. Steen did not make the decision to terminate Ms. Mayes.

After making an initial investigation to verify the report of a cake having been taken, Ms. Steen quickly turned over the investigation to the Loss Prevention Department to pursue and then left for vacation. While Ms. Steen had some involvement in assisting the

---

[10] Ms. Mayes also argues that WinCo failed to keep complete in-store usage logs from 2006-2009 which, she argues, would show the practice of using food for in-store consumption for events during that time and her compliance with the practice of recording such use. (Dkt. 46 at ¶ 20-26.) After 2009, WinCo stopped using the in-store logs and instead had bookkeepers enter items used in-store directly into the computer system but they no longer recorded the employee who took the item. (Dkt. 44-7 at 11-12.) It may be circumstantial evidence that Ms. Mayes adhered to the policy for logging items used in-store prior to her termination, but it does not go to show pretext or gender discrimination.

investigation after she left, the investigation was completed by the Loss Prevention Department. The decision to terminate was then made by WinCo's Human Resources Department.

Although there is some conflicting testimony, there is no dispute that Ms. Steen was on vacation at the time of Ms. Mayes' termination and that Mr. McCartney is the individual who terminated Ms. Mayes. (Dkt. 44-1, Aff. Mayes at ¶ 25.)[11] Mr. McCartney told Ms. Mayes that she was fired for theft and lying. (Dkt. 44-1, Aff. Mayes at ¶ 26) (Dkt. 44-9 at 58.) There are simply no disputed facts or evidence linking any alleged discrimination by Ms. Steen to the termination of Ms. Mayes.

As further evidence of gender discrimination, Ms. Mayes points to Ms. Steen's actions at the grievance proceeding. In her Affidavit, Ms. Mayes states that she attempted to appeal her termination to WinCo's Employee Grievance Committee but that Ms. Steen controlled the committee meeting, cut off an employee who attempted to raise the fact that using a cake in the same manner was common practice for years, and she did not allow Ms. Mayes' statement to be considered at the grievance hearing. (Dkt. 44-1, Aff. Mayes at ¶ 30.) Ms. Steen testified to the Department of Labor concerning Ms. Mayes' complaints stating that at the grievance proceeding she did not "have the floor" and that Ms. Mayes was allowed to speak but she refused to do so. (Dkt. 44-9 at 24.) In her

---

[11]During the October 18, 2011 telephonic hearing before the Idaho Department of Labor Ms. Steen testified that she was involved in the decision to terminate Ms. Mayes. (Dkt. 44-9 at 9.) She later stated in her deposition that she was not present and had not made the decision to terminate Ms. Mayes. (Dkt. 40-11 at 41-42, 59-60, 135-37.) All of the other evidence in the record shows that the termination decision was made by WinCo's Human Resources department, not by Ms. Steen.

deposition, Ms. Steen maintained that Ms. Mayes had submitted a statement for purposes of her grievance but that it was for Ms. Mayes to have read at the grievance hearing. (Dkt. 40-11 at 170-75.) Again, it is disputed as to whether Ms. Steen acted improperly at the grievance proceeding. Even assuming the facts were as Ms. Mayes has alleged, Ms. Steen's conduct at the grievance proceeding does not indicate any pretext for gender discrimination and her actions at the proceeding were not related to the decision to terminate Ms. Mayes.

### iv.     Failure to Discipline Other Employees

As further evidence of pretext, Ms. Mayes points out that other male employees, including other management employees and in particular Andrew Olson, were not terminated or disciplined who had either known of the practice of taking cakes from the bakery, participated in eating the cakes, and/or were otherwise similarly situated but were not fired.[12] In support of this argument, Ms. Mayes has provided Affidavits of her co-workers who stated cakes were often taken for employees to consume in the break room and they had observed other male management employees eating the cake.

The Court finds these allegations regarding WinCo's treatment of the other employees does not show gender discrimination or pretext. The two employees, one male and one female, who had taken the cake on July 7, 2011, Ms. Steen and Mr. McInelly,

---

[12] Ms. Mayes also argues Ms. Steen was not disciplined after she continued to use flavored coffee creamer for in-store use even after WinCo had directed that it would not allow such use. The Court does not find this example to be relevant to her gender discrimination claim as Ms. Steen is not similarly situated to Ms. Mayes nor does it go to prove any gender based discrimination given both Ms. Steen and Ms. Mayes are female.

were both fired for their actions. That the other employees who may have eaten the cake or known of the practice but were not fired does not show gender based discrimination. Instead, the other employees were not fired because the investigation did not reveal that they were responsible for any cake being taken from the bakery like Ms. Mayes and Mr. McInelly.

In her deposition, Ms. Steen, the source of the allegations of gender discrimination, testified that she did not pursue the employees who had eaten any cake and had turned the whole decision over to WinCo's Human Resources Department and Loss Prevention. (Dkt. 40-11 at 134-37.) Ms. Steen explained that the other employees who ate the cake were not fired because they did not take the cake and did not know the cake had not been paid for. (Dkt. 44-9 at 22.) Other employees who knew of the practice but did not report it were not fired, Ms. Steen stated, because they thought Ms. Mayes had permission to have taken the cakes. (Dkt. 44-9 at 24.) Similarly, Mr. McCartney testified that Andrew Olson was not terminated because he did not take the cake. (Dkt. 40-12 at 98-99.) Ms. Steen too testified that had she seen Mr. Olson take a cake he would have been fired too. (Dkt. 40-11 at 133.)

Ms. Mayes simply has not pointed to sufficient facts to show pretext in regards to the failure to discipline other employees who may have partaken in the cakes and/or known of the practice. The other employees were not similarly situated to Ms. Mayes and Mr. McInelly – i.e. they were not responsible for taking cake from the bakery. Moreover,

there is no indication that Ms. Mayes was treated any differently from the other employees in this regard because of her gender.

Outside of the lack of discipline for the cake use, Ms. Mayes also makes allegations concerning having been treated differently than Mr. Olson in regards to having to leave to care for children and being required to report for work even when snowed in. (Dkt. 40-10 at 120-25.) Ms. Mayes maintains that Ms. Steen told her she would be suspended if she did not report even when she was snowed in but that Mr. Olson called in and did not report because of the snow but was not suspended. Ms. Mayes admitted, however, that she was not privy to every conversation between Ms. Steen and Mr. Olson. In his own deposition, Mr. Olson stated that when he arrived late because of snow in 2008 that he had received "points." (Dkt. 40-13 at 45-49.)[13] Mr. Olson went on to testify that he has been disciplined for having received too many points. (Dkt. 40-13 at 45-49.) He also clarified that he has never left work early because of his children and there were times he was not able to stay extra hours because he needed to get home to take care of his children. He testified that he never observed Ms. Steen, or any managers, make negative comments to him or Ms. Mayes regarding their children. (Dkt. 40-13 at 49-51.)

---

[13] In her deposition, Ms. Mayes testified about being snowed-in both in March of 2008 and January of 2009. (Dkt. 40-10 at 125, 170.)

These allegations by Ms. Steen, again, are not sufficiently specific or substantial to raise a triable issue of fact as to pretext. Ms. Mayes' conclusory allegations lack substance going to show that WinCo's proffered motive for her termination was gender based. In particular given that it appears the incident regarding being snowed in occurred in 2008 or 2009, years before Ms. Mayes was terminated.

### v.     Replaced by Males

Following Ms. Mayes' termination, the PIC freight crew position was filled by two males. Ms. Steen testified that Steve Davis and Hoyt Woolley were selected for the position because WinCo needed two more individuals in that position. (Dkt. 40-11 at 52.) Although she weighed in on the decision, Ms. Steen testified that Brad Clark and Scott McCartney selected the new PICs who replaced Ms. Mayes. (Dkt. 40-11 at 52.) Again, there is no link between Ms. Steen's allegedly discriminatory motives/conduct and the decision to hire male employees to fill Ms. Mayes' position.

### vi.     Permission/Authorization

Ms. Mayes maintains that she was given permission by management to take the cakes. (Dkt. 44 at 9.) Whether or not Ms. Mayes was given permission to use cakes to motivate the freight crew is disputed by the parties.

Ms. Mayes testified in her deposition that prior to July 7, 2011 she had told Ms. Steen numerous times when she had taken a cake but that Ms. Steen never mentioned it being in violation of WinCo policy. (Dkt. 40-10 at 50-52, 66-67.) Ms. Mayes also stated that she had asked Brad Clark and/or Scott McCartney for permission to take a cake to

celebrate birthdays. (Dkt. 40-10 at 75-76.) In support of her response to the Motion, Ms.

Mayes filed an Affidavit of Mr. McInelly stating the practice of taking cakes to the break

room for the freight crew to eat was done with management present on a number of

occasions and that he witnessed Mr. McCartney, Mr. Clark, Mr. Olson, and Mr. Watson

consume cake in the break room. (Dkt. 45-1, Aff. McInelly.) He went on to state that on

many occasions either an assistant store manager, Scott McCartney or Brad Clark, or one

of the PICs, Ms. Mayes, Andrew Olson, or Steve Watson, would bring a cake into the

break room for the freight crew to consume. (Dkt. 45-1, Aff. McInelly.) Mr. McInelly

states in his Affidavit that he heard both Mr. McCartney and Mr. Clark give Ms. Mayes

permission to take cakes.

Similarly, Kayla Horkley, who worked at customer service at WinCo, testified in

her deposition that she heard Mr. McCartney give approval to take a cake. (Dkt. 44-6 at

40-41, 48-51.) The Affidavit of Chris Priest, a WinCo employee on the night freight crew,

contains observations consistent with Mr. McInelly and Ms. Mayes regarding the practice

of in-store use of cakes. He states that management knew of, participated in, and

consumed the cakes consistent with the practice. (Dkt. 45-2, Aff. Priest.) The deposition

of Mark Lynch, who worked on the freight crew, also recalled eating cake in the break

room and saw Mr. McCartney and Mr. Clark eat the cake as well. (Dkt. 44-5 at 18-19.)

He also testified that the practice of in-store use of cakes was allowed prior to Ms. Mayes

being fired and was "shut off" after her termination. (Dkt. 44-5 at 15-16.)

Ms. Steen, on the other hand, claims in her Declaration that she obtained statements from all management named by Ms. Mayes verifying that they had not given Ms. Mayes permission to take cakes from the stale cart. (Dkt. 44-14.) Mark Wright's Declaration too states that during the time he managed the Idaho Falls store he did not give Ms. Mayes or anyone else permission to take cakes from the bakery to motivate the freight crew. (Dkt. 40-6, Dec. Wright.) He went on to state that they would celebrate birthdays once a month and he would order the cakes in advance and he paid for them. Mr. Wright further states that the use of stale cakes for employee consumption would be a departure from WinCo's protocol of donating stale product. (Dkt. 40-6, Dec. Wright.) Mr. McCartney likewise denied having ever given Ms. Mayes permission to get cakes. (Dkt. 40-12 at 88.)

Whether or not Ms. Mayes had permission to use cakes in the manner in which she had been is disputed but it is not a material fact relevant to her claim for gender discrimination or pretext. Again, Ms. Mayes' gender discrimination claim is based solely on the actions and comments of Ms. Steen. (Dkt. 40-10 at 129-30.) There are no allegations that Ms. Steen improperly influenced any of the managers to give or to not give permission to Ms. Mayes regarding taking the cakes or to otherwise mislead Ms. Mayes into believing she could do so. Let alone that Ms. Steen did so because she was motivated by a gender bias against Ms. Mayes. This disputed fact may be relevant to some type of wrongful termination claim; i.e. that Ms. Mayes was improperly terminated because she had not violated WinCo's policy for in-store use of products. That Ms.

Mayes believed or was authorized to use the cakes in the manner in which she did, does not demonstrate that her termination was motivated by any gender discrimination.

### c) Conclusion

Ms. Mayes' arguments do not demonstrate pretext. They are simply her sense of what happened. Ms. Mayes' claims of discrimination are based solely on comments and conduct by Ms. Steen who, Ms. Mayes argues, "had a problem with her." (Dkt. 46 at ¶ 30.) Ms. Mayes testified that Ms. Steen "was not a very nice person towards me" and that she had been told Ms. Steen did not like her. (Dkt. 40-10 at 119, 124.) Subjective beliefs, however, do not prove pretext. *Aragon*, 292 F.3d at 661–64 (at pretext stage of analysis, "an employee's own statement that he was performing at a level equal to that of other employees is not enough to raise a genuine issue of material fact"); *see also Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) ("mere assertions ... [of] discriminatory motive and intent ... were inadequate, without substantial factual evidence, to raise an issue precluding summary judgment"). "Circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Bergene v. Salt River Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001). The allegations made by Ms. Mayes here are neither and, as a result, "she has not shown that 'either ... a discriminatory reason more likely motivated [WinCo] or ... that [WinCo's] proffered explanation is unworthy of credence.'" *Villiarimo*, 281 F.3d at 1063 (citation omitted).

Considering all of the evidence provided by Ms. Mayes in support of her claim, the Court concludes that Ms. Mayes has not shown the existence of a genuine issue of material fact that WinCo's stated reasons for her termination are pretextual. Accordingly, the Court will grant the Motion for Summary Judgment on the gender discrimination claim.

## III.    COBRA Claim

Under COBRA, "continuation of coverage under an employer's group health plan is available for up to eighteen months to qualified beneficiaries." 29 U.S.C. §§ 1162(2) & 1167(3). COBRA requires an employer to notify an employee of the availability of COBRA benefits and provide these benefits to the employee upon the occurrence of a "qualifying event." 29 U.S.C. § 1166. Under 29 U.S.C. § 1163, qualifying events include "the termination (other than by reason of [the] employee's gross misconduct), or reduction of hours, of the covered employee's employment." 29 U.S.C. § 1163(2).

Ms. Mayes was terminated on July 7, 2011. WinCo denied her COBRA coverage on the basis that she was terminated for gross misconduct - theft and dishonesty - and, therefore, her termination was not a qualifying event under § 1163. Ms. Mayes claims her termination was a qualifying event not for gross misconduct and, thus, WinCo unlawfully denied her coverage.

"There are no regulations defining 'gross misconduct' for purposes of the statute, and 'federal case law addressing the subject is sparse.'" *Moore v. Williams College*, 702 F.Supp.2d 19, 24 (D. Mass 2010) (citing *Zickafoose v. UB Services, Inc.*, 23 F.Supp.2d

652, 655 (S.D. W.Va. 1998)). Courts have generally found that mere negligence, mistake, carelessness, or incompetence does not rise to the level of gross misconduct. *Id.* (quoting *Mlsna v. Unitel Communications, Inc.*, 91 F.3d 876, 881 (7th Cir. 1996); (citing *Nakisa v. Continental Airlines*, No. H–00–090, 2001 WL 1250267, at *2 (S.D. Tex. May 10, 2001); *Cabral v. Olsten Corp.*, 843 F.Supp. 701, 704 (M.D. Fla.1994)). Gross misconduct generally has not been found where the behavior at issue was "inadvertent or sporadic—for example, where a forgetful employee occasionally neglected an employer's instructions" or where the misconduct amounts to a simple mistake or inattention to detail. *Id.* (citations omitted).

Gross misconduct under COBRA has been found where the actions were more than minor violations of an employer's policy or standards but are instead extreme, unconscionable, or conduct that is so outrageous that it shocks the conscience. *Shrimpton v. Quest Diagnostics Inc. et al.*, No. 1:10-cv-00513, 2011 WL 2604749, at *5 (N.D. Ohio Jan. 24, 2011) (citing *Moore*, 702 F.Supp.2d at 24). Such a finding include instances where the misconduct is "intentional, wanton, willful, deliberate, or reckless; or that is performed with deliberate indifference to an employer's interests." *Id.* (citing cases). For instance, "courts have found gross misconduct where a drunken employee crashed an employer-provided car; where an employee called a co-worker a racial slur and threw an apple at her; where an employee battered a co-worker, placing her in the hospital; where an employee stole from her employer; and where an employee repeatedly and persistently refused to follow the instructions of his supervisor." *Moore*, 702 F.Supp.2d at 24

(citations omitted).

The Court finds Ms. Mayes has failed to show that a genuine issue of material fact exists as to whether or not she was termination was for gross misconduct. Stealing from and/or lying to one's employer, regardless of the value of the item, constitutes a willful and intentional disregard for the interests of one's employer and is properly considered "gross misconduct" under COBRA. As determined above, Ms. Mayes has not shown that her termination was based on gender discrimination. Ms. Mayes has made allegations that she should not have been fired for theft because she had permission to take cakes from the bakery and allegations regarding WinCo's investigation. She has not, however, raised a claim for wrongful termination. Whether or not Ms. Mayes had permission to use the cakes as she did or the taking of cakes was a commonly accepted practice is disputed. Regardless, WinCo's written policy, which Ms. Mayes agreed to, is clear and provides that theft and/or dishonesty are considered gross misconduct. (Dkt. 40-8.) The Affidavit of Kayla Horkey filed with Ms. Mayes' response, states that her understanding of WinCo's policy concerning theft was that you would be fired regardless of the value of the item. (Dkt. 44-6 at 21.) The same policy, Ms. Horkey states, applies to dishonesty. (DKt. 44-6 at 23.)

On the record here, the Court finds Ms. Mayes has not shown the existence of a material fact that she was terminated for any reason other than theft and dishonesty. WinCo's procedures define such offenses as "gross misconduct." The Court finds that definition is consistent with the case law interpreting COBRA's use of the term "gross

misconduct." Because Ms. Mayes has not offered any facts or evidence that her termination was based on anything other than theft and/or dishonesty, the Court finds she was terminated for gross misconduct and WinCo's denial of COBRA benefits was proper. The Motion for Summary Judgment on the COBRA claim is granted.

## IV. Wage Claims

Count four of the Complaint raises a federal and state wage claims seeking repayment for accrued PTO including vacation pay, personal days, and a bonus day for perfect attendance. (Dkt. 12 at 10.) Ms. Mayes contends at the time of her termination she had accrued 144 hours of PTO which WinCo has refused to pay her. The claims are brought under Idaho Code § 44-1503 and § 45-601 as well as the Fair Labor Standards Act, 29 U.S.C. § 203(d).

WinCo argues the wage claims are precluded by the terms of its Hourly Employee Working Conditions & Wages Agreement" (CBA). (Dkt. 40-1 at 20) (Dkt. 40-20.) Section I(8) of the CBA states:

> Vacation earned but not taken will not be paid to employees terminated for gross misconduct under the Company Personnel Policies defining gross misconduct.

(Dkt. 40-20 at 6.) WinCo maintains that because Ms. Mayes was terminated for theft which is defined by its policies as "gross misconduct" that she is not entitled to repayment for her accrued vacation. (Dkt. 40 at 21.)

Ms. Mayes counters that she is not bound by the CBA and, alternatively, that the CBA is an illegal and/or unenforceable contract. (Dkt. 44 at 20.) Ms. Mayes points out

that she did not sign the CBA and it was not negotiated by any union representing Ms. Mayes. Ms. Mayes argues the Employee Association Committee was not a union representing Ms. Mayes and, therefore, she is not bound by the CBA. (Dkt. 44 at 20.) In reply, WinCo argues Ms. Mayes is bound by the CBA because the Idaho Falls WinCo store is established as a union facility with an Employee Association Committee that negotiates and signs the CBA binding all of the employees. (Dkt. 50 at 11.) Mr. Swanson's Declaration states that WinCo's Idaho Falls store is an established union facility and all of its hourly, non-management employees are bound by the CBA as negotiated and signed by an Employee Association Committee. (Dkt. 50-3.) Further, WinCo points out that when she was hired at her orientation, Ms. Mayes initialed her name to the company personnel policies section indicating she had read and understood the "Labor Agreement/Contract." (Dkt. 50 at 11) (Dkt. 50-2 at 53.)

Employees have the right under federal law to organize and bargain collectively. 29 U.S.C. § 157. "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5). The CBA applicable to WinCo's Idaho Falls store #42 expressly states that WinCo recognizes the "Hourly Employee Association as the sole collective bargaining representative of the employees at Store #42 in Idaho Falls, Idaho...for the purpose of establishing wages, hours and

conditions of employment for all such hourly, non-management employees." (Dkt. 40-20.) The CBA provides detailed policies regarding hours, scheduling, seniority, discharges, breaks, wages, stocks, vacations, leave, and other policies. (Dkt. 40-20.) Notably, the CBA contains grievance procedures available to the employees subject to its policies.

Ms. Mayes has not provided evidence creating a triable issue of fact that the CBA did not apply to her. The expressed provisions of the CBA coupled with Ms. Mayes' signature of WinCo's policies and initialing of the Labor Agreement/Contract section of the Store Orientation sheet establish that the CBA was applicable to her during her employment at WinCo. Ms. Mayes' allegations regarding Ms. Steen's characterization of the Employee Association as a "committee" and generalized complaints regarding the grievance proceedings do not draw into dispute the applicability of the CBA to her employment while at WinCo. This is particularly true in light of the fact that Ms. Mayes pursued the grievance proceedings as provided to her under the terms of the CBA before now arguing the CBA is not binding on her.

Based on the foregoing, the Court finds Ms. Mayes has failed to raise a genuine issue of material fact that the CBA applies to her and that she was fired for "gross misconduct." WinCo terminated Ms. Mayes for theft and dishonesty. Under the terms of the CBA, her wage claims are precluded. Accordingly, the Motion for Summary Judgment on the wage claims is granted.

## <u>ORDER</u>

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1) Defendant's Motion for Summary Judgment (Dkt. 40) is **GRANTED**. This matter is **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**.

2) Plaintiffs' Motion to Strike the Declaration of Gary Pickel (Dkt. 43) is **GRANTED IN PART AND DENIED IN PART**.

3) Defendant's Motion to Strike Affidavit of Trent Gallup (Dkt. 50, App. A) is **DENIED**.

4) Defendant's Motion to Strike (Dkt. 51) is **DENIED**.

5) Plaintiffs' Motion to Strike Declarations of Beth Rieb and Ben Swanson (Dkt. 53) is **GRANTED IN PART AND DENIED IN PART**.

DATED:  **April 23, 2014**

Honorable Edward J. Lodge
U. S. District Judge